Mary Kay WILLIAMS, Appanoose County Treasurer, Appellant,

v.

Robert N. VAN SICKEL, Richard Van Sickel, Janet M. Hanes n/k/a Janet M. Longley, and Greg Wilson, Appellees.

No. 01–2044.

Supreme Court of Iowa.

April 2, 2003.

Robert F. Bozwell, Jr., Centerville, for appellant.

Bradley M. Grothe of Orsborn, Bauerle, Milani & Grothe, L.L.P., Centerville, for appellees Robert N. Van Sickel, Richard Van Sickel, and Janet M. Longley.

John A. Pabst of Pabst Law Firm, Albia, for appellee Greg Wilson.

LAVORATO, Chief Justice.

Mary Kay Williams, the Appanoose County Treasurer, appeals from a district court judgment dismissing her action to obtain a personal judgment against the defendants, Robert N. Van Sickel, Richard Van Sickel, Janet M. Hanes (n/k/a Janet M. Longley) (collectively "Van Sickels"), and Greg Wilson for unpaid ad valorem real estate taxes, and granting the Van Sickels' request for attorney fees. We affirm in part, modify in part, and remand with directions.

## I. Background Facts.

On March 1, 1981, Greg Wilson entered into a buy-sell agreement with E.F. and Gertrude W. Van Sickel to purchase the assets of a fertilizer business in Appanoose County. The assets included some buildings, machinery, and equipment located on land leased from the Milwaukee Railroad.

Wilson agreed to make yearly payments toward the purchase price and to give the seller such "financing statements and security agreements as are necessary to establish a first lien in favor of the Seller on all of the properties being transferred." In a separate document, in which E.F. assigned the lease with the railroad to Wilson, Wilson agreed to pay "all taxes and assessments accruing during the tax year in which this assignment takes place and subsequent years." In this document, Wilson also agreed to be bound by the terms and conditions of the lease with the railroad.

Wilson took possession of the business at the time of the buy-sell agreement and operated it as Wilson Feed & Fertilizer Company. The transfer was noted on the county assessor's property card and from there was placed on the tax-collection rolls. Wilson paid the taxes on the property and in 1983 or 1984 added two grain bins to the site.

E.F. Van Sickel died in 1984. In 1985, E.F.'s children, the Van Sickels, entered into a stipulation and settlement with the estate whereby the Van Sickels would receive the estate's and Gertrude's interest in the buy-sell agreement. In 1988, Gertrude, individually and as executor of the estate, assigned all right, title and interest in the buy-sell agreement to the Van Sickels.

In the meantime, Wilson filed for bankruptcy in May 1988. He made payments on the buy-sell agreement until approximately 1985. Even though they never received payment from Wilson on the agreement, the Van Sickels took no action to enforce it or to repossess the property subject to the buy-sell agreement.

The property card maintained by the county assessor for the property on the leased land listed the Van Sickels as owners, contracted to Wilson, as of December 1988. Robert Van Sickel was listed as the Van Sickels' local representative. The property card indicated the assessed value of the property subject to the buy-sell agreement and the two grain bins (hereinafter "the property") was $45,000. This figure was based on a 1984 assessment of the property by the State of Iowa.

In May 1990, Mary Kay Williams, the Appanoose County Treasurer, notified Robert Van Sickel that the property would be offered at the county's annual tax sale in June. The treasurer knew at the time that she was not going to sell the property because, as she testified, a tax deed cannot be issued for buildings on leased land.

Upon receiving the notice, Robert Van Sickel contacted the treasurer. He told her that he and his siblings held no ownership of the property because they had inherited only the contract seller's right to payment.

Contrary to the notice, the treasurer did not offer for sale the property on the date of the June sale because the county could not issue a tax sale deed for buildings on leased land. She claimed that (1) buildings on leased land caused problems with the office's computer software system and (2) the computer company advised her to issue tax sale certificates for such buildings so that the office could proceed with the tax sale application and the new year's taxes.

Even though the property was not offered or sold on the day of the tax sale, the treasurer signed a "certificate of tax sale" on June 18, 1990. The tax sale certificate indicated that the property had been sold to Appanoose County at a tax sale on that date and that the total tax, penalty, and costs amounted to $10,763.

A year later—on April 15, 1991—the treasurer sent a tax sale notice to Robert Van Sickel and Wilson. The notice listed Wilson as the "person in possession" and the Van Sickels as the "person in whose name the property described below is being taxed." The notice described the property and stated that (1) the property had been sold on June 18, 1990 for the then delinquent and unpaid taxes against the property to Appanoose County, (2) a certificate of purchase had been issued to Appanoose County, and (3) "the right of redemption will expire and a deed for the said real estate will be made within ninety (90) days from the completed service of this notice."

Robert Van Sickel testified that as he understood the notice, it gave him two choices: either redeem the property, or the county would take the deed. He thought the county was going to take the deed to the property and he and his siblings would not have any tax liability, so he took no further action.

Wilson testified that if he had known he had some responsibility for the taxes, he would have taken action. He continued to receive tax statements after his bankruptcy discharge, but did not receive any statements after 1991.

## II. Proceedings.

In December 1997, the treasurer sued the Van Sickels and Wilson seeking a judgment against them for delinquent and unpaid "ad valorem real estate taxes" of $30,290.07 (later reduced to $26,167.00) against the property. (In 1991, machinery and equipment which were part of the property were no longer subject to taxation.) The petition alleged that pursuant to Iowa Code sections 445.3, 445.32, and 446.20 (1997), the defendants were personally liable for the taxes either as owners in fact or as beneficial owners.

Later, the district court granted the defendants' motions for summary judgment and dismissed the petition. The court concluded that the treasurer could not collect delinquent taxes pursuant to a tax certificate issued prior to April 1, 1992, the effective date of Iowa Code section 445.3. (Before passage of section 445.3, a county treasurer could only collect unpaid taxes for buildings on leased land by pursuing a distress warrant and selling the property pursuant to that warrant. *See* Iowa Code §§ 445.8, .32 (1991)).

Following the treasurer's appeal and our transfer to the court of appeals, that court held that the treasurer could not seek a personal judgment for delinquent taxes accrued prior to April 1, 1992. The court of appeals further held that a tax certificate

was not necessary for the treasurer to seek a personal judgment for taxes accrued after April 1, 1992, and for that reason a claim for those taxes could proceed. In reaching these conclusions, the court of appeals relied on our decision in *Hiskey v. Maloney*, 580 N.W.2d 797, 799 (Iowa 1998) (holding that Iowa Code section 445.3, which permits the county to secure a personal judgment to collect delinquent real estate taxes, does not apply retroactively to the collection of taxes included in tax sale certificates issued before April 1, 1992, the effective date of the amendments). The court of appeals affirmed in part, reversed in part, and remanded the case to allow the treasurer to proceed with the claim for delinquent taxes accruing after April 1, 1992.

On remand, the defendants pled, among other things, an affirmative defense of estoppel. Following a bench trial, the district court ruled that the defendants had met their burden of establishing by clear, convincing, and satisfactory evidence their defense of estoppel. Therefore the treasurer was "estopped from claiming taxes accrued after April 1, 1992."

In addition, the district court concluded that even if the treasurer were not estopped, she had failed to prove the defendants owned the property. Thus, the court concluded, a preponderance of the evidence failed to establish that either the Van Sickels or Wilson were lawful owners of the property.

Finally, the district court granted the Van Sickels' request for attorney fees. The treasurer appealed, contending the district court erred in its findings and conclusions and in awarding attorney fees. The Van Sickels cross-appealed, seeking appellate attorney fees.

We recite additional facts as they relate to the issues we discuss.

**III. Issues.**

Because we conclude the ownership issue is dispositive of the appeal, we confine our discussion to it and to the issue of attorney fees.

**IV. Scope of Review.**

Before receiving evidence, the district court made the following record:

> This case involves some mixed issues of law and equity. Counsel and I have discussed that in chambers, and what we are going to do is make an equitable record that will allow all equity issues to be preserved for appellate review de novo.... What that will mean in practical terms is that when objections are made, we'll have the record preserved at those objections, but all offered evidence will come into the record and that will be subject to objections.

We interpret the district court's remarks to mean that it was keeping the issues of law and equity separate but for convenience would take all evidence subject to objection.

The treasurer brought her action pursuant to section 445.3, which expressly provides that such suits are to be "commenced, tried, and prosecuted to final judgment the same as provided for ordinary actions." Iowa Code § 445.3. Ordinary actions are tried at law. *See Matter of Oseing*, 296 N.W.2d 797, 800 (Iowa 1980) ("Special actions are tried as ordinary actions at law unless made triable in equity by statute...."). Because ownership is a predicate for the type of relief the treasurer is seeking, we conclude our review on the ownership issue is for corrections of errors of law.

Because our review is at law, we are bound by the district court's findings on the ownership issue if substantial evidence supports those findings. *Frontier*

*Properties Corp. v. Swanberg,* 488 N.W.2d 146, 147 (Iowa 1992). Evidence is substantial "if reasonable minds would find it adequate to reach the same conclusion even if we might draw a contrary inference." *Id.*

### V. The Ownership Issue.

As mentioned, the treasurer could seek personal judgment for taxes accruing after April 1, 1992. The district court concluded that "the county's record of the property ownership is unreliable and too weak to support personal judgment," leading the court to further conclude there was a failure of proof as to the defendants' ownership on or after April 1, 1992. For reasons that follow, we agree.

**A. The Van Sickels.** The district court correctly interpreted the Van Sickels' interest arising from the assignment from Gertrude and E.F.'s estate as merely a right to receive contract payments. The buy-sell agreement also required Wilson to provide the financing statements and security agreements necessary to establish a security interest in favor of the seller. *See* Iowa Code § 554.2401(1) ("Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.").

The district court found that after the assignment, the Van Sickels never took any affirmative action to exercise any of their collection options—such as repossession—when Wilson failed to make payments. The court further found that the Van Sickels did not want the business back and wanted to avoid environmental liabilities that might arise from a "defunct fertilizer facility." Substantial evidence supports these findings.

Given the nature of the buy-sell agreement and a lack of action by the Van Sickels to enforce their collection options, we agree with the district court that "[a]

preponderance of the evidence fails to demonstrate that the Van Sickels were the owners of the property."

Apparently, the treasurer now agrees with this conclusion for she did not assert in her appellate briefs that the Van Sickels were owners who were liable for the taxes. Rather, she now asserts that Wilson should be responsible. We also note that in oral argument, the treasurer conceded the Van Sickels have no liability for the taxes.

**B. Wilson.** As to the treasurer's claim that Wilson was the owner of the property and therefore responsible for payment of the delinquent taxes, the district court made the following findings rejecting that claim.

Wilson quit making payments under the buy-sell agreement in 1985, abandoned the property in early 1987, and filed bankruptcy in 1988. Sometime during this period, a liquidation company ended up with ownership of the two grain bins and sold them to James Wilson, Greg Wilson's father.

In 1990, the county assessor visited the site, saw a pit filled with water, and recognized the hazard posed some possible liability. The local board of health had been alerted to the condition of the property. At this time the assessor confirmed the property had been abandoned for some time, it was in a dilapidated condition, and it was not worth what it had been appraised for in 1984. The assessor never entered any of this information on the property card. Nor did the assessor try to determine ownership even though the property had obviously been abandoned.

Record keeping regarding ownership of property on leased land in the assessor's office is informal, leading to inaccuracies. The record keeping is premised on officials in various offices noticing a transfer, taking the initiative to pass the word along to

other county officials, making factually and legally accurate notations, and keeping the data reasonably current with available information. The assessor also relies on information from the public. Once the assessor notes on the property card a change in title gleaned from transfer documents forwarded by the recorder, or through other information received, removing names from the card is far more rigorous. Unless a removal is noncontroversial, all names stay on.

Someone at some time had crossed Wilson's name off the assessor's property card, leaving a "current" reference to only the contract sellers. At some point, the assessor updated the property card to show the assignment of the seller's interest in the buy-sell agreement to the Van Sickels. Robert Van Sickel was listed as the Van Sickels' local representative.

County action commonly undertaken to monitor taxable property was conspicuously absent from 1984, when the State appraised the property, until 2000, when new ownership was documented. During that time the county assessor never inspected the property for the official purpose of monitoring what was there, determining who owned it, or seeking to re-value it in recognition of its obvious deterioration and obsolescence.

Over the years, none of the county's tax records were adjusted to reflect various recorded railroad deeds that came through the recorder's office. For example, a reconveyance deed from Soo Line Railroad and CMC Real Estate Corporation was recorded July 24, 1989, but was never noted on the assessor's property card. This deed purported to convey railroad land underlying the fertilizer business and transferred "all structures, fixtures and improvements located thereon." (The original lease between E.F. Van Sickel and the railroad provided that the railroad could consider a failure to remove property following a termination of the lease an abandonment of the property to the railroad.)

In addition, the assessor failed to notice that a quitclaim deed between CMC Real Estate Corporation and the Chicago Milwaukee Corporation was recorded February 26, 1992, deeding the real estate "together with all the appurtenances, fixtures, tracks, signals, equipment and personal property, if any, owned ... and used in connection therewith...." On the same day, the Chicago Milwaukee Corporation made the same transfers to CMC Heartland Partners, which transfers also went unheeded.

The record reflects that CMC Heartland Partners conveyed the land in question to Carol M. and Raymond D. Johnson on May 26, 1998. This deed was recorded. On June 26, 2000, the district court entered a decree quieting title in the Johnsons against the Van Sickels, Wilson, and the county. The decree quieted title not only to the land, but also to all buildings, structures and fixtures located on the land. The confusion regarding ownership was finally cleared up and the assessor's records were adjusted to reflect ownership of the property in the Johnsons.

In 1998, when the Johnsons first inquired about the delinquent taxes, the assessor's records did not reflect that Wilson had put the grain bins on the land after the buy-sell agreement was executed. Additionally, the records failed to disclose that Wilson's father had bought the bins in 1988. The January 1, 2000 assessment reflected those facts for the first time. Without the bins the property was valued at $10,000, rather than the $45,400 valuation after the 1984 appraisal.

■ Substantial evidence supports all of these findings. Based on those findings

the district court reached the following correct conclusions:

> A preponderance of the evidence does not demonstrate that Wilson was a lawful owner of the taxed property either. He was the last owner that the county took note of, but he abandoned the property in 1988, and there were broad railroad transfers in the meantime, which may well have enveloped all of the deserted property on the site. The fact that the county did not react to the railroad transfers cannot serve as proof of Wilson's ownership. It is the treasurer's burden to prove that Wilson owes taxes accruing after April 1, 1992. She has failed to do that under the preponderance-of-the-evidence standard.

> The sum of taxes the treasurer seeks to collect for past assessments on the grain bins cannot properly be collected from either the Van Sickels or Wilson. A preponderance of the evidence reveals that James Wilson has owned those improvements since about 1988, and he has not been made a party to this action.

## VI. The Attorney Fee Issue.

The district court awarded the Van Sickels $16,222.36 in attorney fees. The treasurer contends the district court erred in awarding these fees. In awarding the fees, the district court relied on our decision in *Hockenberg Equipment Co. v. Hockenberg's Equipment & Supply Co.*, 510 N.W.2d 153 (Iowa 1993). The treasurer contends her conduct does not meet the high standard set in that case for an award of common law attorney fees.

■ Generally, a party has no claim for attorney fees as damages in the absence of a statutory or written contractual provision allowing such an award. *Id.* at 158. There is no such statutory or written contractual provision in this case. Therefore, the Van Sickels must find support for such an award under the common law. *See id.*

■ Whether to grant common law attorney fees rests in the court's equitable powers. *Id.* Our review of this issue is therefore de novo. *See id.;* Iowa R.App. P. 6.4.

■ To obtain common law attorney fees, a party must prove "that the culpability of the [opposing party's] conduct exceeds the 'willful and wanton disregard for the rights of another' " standard required to prove punitive damages. *Hockenberg Equip. Co.*, 510 N.W.2d at 159. The opposing party's conduct "must rise to the level of oppression or connivance to harass or injure another." *Id.* at 159–60. "Oppressive" conduct "denotes conduct that is difficult to bear, harsh, tyrannical, or cruel." *Id.* at 159. "Connivance" is defined as "voluntary blindness [or] an intentional failure to discover or prevent the wrong." *Id.* (citation omitted). "These terms envision conduct that is intentional and likely to be aggravated by cruel and tyrannical motives. Such conduct lies far beyond a showing of mere 'lack of care' or 'disregard for the rights of another.' " *Id.*

Here, the district court found that the treasurer "issued a series of misleading documents, in the form of a tax sale certificate and a tax sale notice she now claims was ineffectual." Additionally, the court found that the treasurer "fabricated records and certified them into pretrial discovery and then offered them as trial evidence. She testified falsely about her retrieval of records.... She sat on the county's rights to seek collection, to the substantial detriment of the defendants." In awarding the attorney fees, the court found that "[t]he totality of the treasurer's actions here attain a level emblematic of 'harsh, tyrannical' motivations and an 'intentional failure to discover or prevent the wrong.' " (Citation omitted.)

To understand the district court's ruling, we need to put the court's findings in context.

As mentioned, one of the affirmative defenses the Van Sickels and Wilson asserted was equitable estoppel premised on the treasurer's April 15, 1991 notice, a defense the district court upheld. In addition, the Van Sickels asserted counterclaims for damages against the treasurer, also premised on that notice. The counterclaims were for fraudulent misrepresentation and negligent misrepresentation, both of which the district court dismissed following the bench trial.

 The elements of equitable estoppel include the following: the opposing party misrepresented or concealed material facts; the party relying on estoppel lacked knowledge of the true facts; the party misrepresenting or concealing the true facts intended the deceived party to act on those representations; and detrimental reliance by the party to whom the representations were made. *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 271 (Iowa 2002).

Like the equitable estoppel defense, the fraudulent misrepresentation and negligent misrepresentation claims both include the element of reliance, which is important in understanding the significance of the treasurer's conduct. *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001) (plaintiff must prove reliance to establish claim of fraudulent misrepresentation); *Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994) (reliance an element of negligent misrepresentation).

At trial, two letters the treasurer introduced into evidence became the source of much discussion and debate. The treasurer testified that once she determined the April 15, 1991 tax sale notice had been sent in error, she sent letters to Robert Van Sickel and Wilson. The letters explained that the tax sale notice had been sent in error and should be disregarded, and that the county would not be taking the deed. The treasurer claimed she found the letters approximately three months before the trial while emptying out a box of old records under her desk to make more legroom. The alleged discovery was also shortly after the district court denied the treasurer's motion to dismiss the counterclaims.

The letters were not dated, and the treasurer provided no proof that the letters were mailed. Robert Van Sickel and Wilson testified they had never seen the letters.

Letters admitted into evidence that were dated 1990, 1992, and 1994 were typed on a typewriter, using preprinted letterhead. The letterhead used in the letters allegedly sent to Robert Van Sickel and Wilson shortly after the tax sale notice is identical to letterhead used in letters dated 1997, which were typed on a computer.

Marla Belloma, former employee of the treasurer, testified that the treasurer used letterhead stationary and a typewriter to type all correspondence in 1991. She also testified that there were no personal computers capable of producing letters like those allegedly sent to Robert Van Sickel and Wilson in the office in 1991.

Olive Hand, another former employee, testified about a tax sale of property owned by Gladys Depuy, which occurred in the late 1980s. Depuy claimed she had not received any notification that the property had been sold at a tax sale. Hand and two other co-employees looked through the correspondence file and could not find a letter from the treasurer to Depuy. The next day the file was on Hand's desk, and the treasurer asked her to look in the file

again for the letter. This time, Hand found a letter notifying Depuy that her property had been sold. Hand testified she believed the letter had been typed and put in the file for someone to find. Depuy eventually lost her home through the tax sale process.

On our de novo review, we agree with the district court that the treasurer had fabricated the two letters after the start of the lawsuit. The treasurer compounded the fraud by offering them as evidence at trial.

Obviously, her intent was to disprove the reliance element necessary for the estoppel defense and the fraud counterclaims, thereby establishing her case against the defendants and defeating their counterclaims against her. At this point, we think the treasurer crossed the line, causing her conduct to rise to a level above "the willful and wanton disregard of the rights of another" standard required to prove punitive damages.

We agree with the Van Sickels that "[i]t is hard to imagine behavior that would be more oppressive or conniving than a public official creating documents which benefit herself to the detriment of those she is elected to represent." Equally oppressive and conniving was her attempt to defraud the district court in her scheme to protect herself from liability.

 Nevertheless, we think the attorney fee award should be modified by limiting the award to the time and effort the Van Sickels' attorney expended after the treasurer claimed she discovered the two letters (approximately three months before trial) and embarked on her fraudulent scheme. In addition, the Van Sickels are entitled to appellate attorney fees because the treasurer continues to insist here that she did not fabricate the letters, causing the Van Sickels to defend once again against this claim.

### VII. Disposition.

In sum, we conclude the treasurer failed to prove the Van Sickels or Wilson owed the taxes assessed after April 1, 1992. We therefore affirm the district court's judgment dismissing the treasurer's petition.

We further conclude the treasurer's conduct rose to the level justifying an award of attorney fees incurred in the district court as well as on appeal. However, we modify the district court's award as to the amount of fees awarded in the district court and remand the case for a new determination of such fees as we have directed.

On remand, the district court is also to determine the amount of appellate attorney fees the Van Sickels are entitled to recover.

**AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED WITH DIRECTIONS.**